UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
SCOTT MCGOWAN,                            )
         Plaintiff,                       )
                                          )
v.                                        )        Docket No. 20-30131
                                          )
TOWN OF WILLIAMSTOWN,                     )
KYLE JOHNSON, and                         )
JASON HOCH,                               )
         Defendants.                      )
_____ )

## **COMPLAINT AND JURY DEMAND**

### INTRODUCTION

1.      For well over a decade, the Williamstown Police Department (WPD or Department) has

maintained an atmosphere in which racial harassment and hostility to persons of color are

tolerated and perpetrated at the highest level, to the extent that one officer of color left the

Department just to escape the demeaning behavior of Chief Kyle Johnson (Johnson or the Chief).

Town Manager Jason Hoch (Hoch) was made aware of Johnson's discriminatory behavior but

did not investigate or intervene to stop it; his concern was only that the reputation of the Town of

Williamstown (Williamstown or the Town) might suffer if these facts were publicized.

2.      Johnson was also aware of an incident when a dispatcher shouted the N-word in the

Williamstown police station, in the presence of other officers and a visiting student from

Williams College. Although the dispatcher admitted this conduct, Johnson took no formal

disciplinary action. The dispatcher remains with the WPD.

3.      As another example of Defendants' lack of concern about discrimination, a WPD officer

had a picture of Adolf Hitler in his locker in the Williamstown police station, where every officer

could see it, for years. A true and correct photograph of the officer's locker as it existed in 2018 is attached hereto as Exhibit A. The Town and the Department did nothing to address the implications for the workforce of having to see that photo posted prominently. That officer remains on the force.

4.      The WPD has also turned a blind eye to sexual assault and sex discrimination. Johnson, in his capacity as Chief, personally sexually assaulted male and female members of the WPD staff by deliberately rubbing his clothed penis up against them, over their explicit objections. (Johnson now characterizes his actions as "unprofessional and juvenile locker room behavior.") This behavior constituted sexual harassment as well as criminal sexual assault, and was totally unbecoming for an officer of the law.

5.      Johnson was also aware that an officer (the same officer who had the Hitler photo in his locker) was accused and investigated by the Massachusetts State Police for sexually assaulting a Williamstown resident. In the course of that investigation, the officer first denied the incident, then admitted it. Although the officer had both lied to the State Police and acknowledged committing the crime of indecent assault and battery, Johnson docked the officer a few vacation days and kept him on the force, with no consideration of the message that limited punishment sent to victims of sexual assault and harassment within and outside the Department.

6.      Johnson has also belittled at least one female officer by calling her "baby girl" and "bae," and has spoken negatively about the prospect of potentially having to promote a female officer of color under the Civil Service system, doubling down by stating under oath that she "is not suited to a supervisory role."

7.      Plaintiff Scott McGowan (Plaintiff or McGowan), a sergeant in the WPD, has spoken out against the Chief's offensive behavior and the WPD's discriminatory environment over many

years, going back to 2007 when he first resisted the Chief's sexual harassment. Although McGowan only wanted to make the Department better and weed out the few "bad apples," he has faced retaliation in response. Gradually, as McGowan's opposition to unlawful discrimination continued, his responsibilities were reduced, as the Town itself acknowledges. For example, in 2016, McGowan assisted an officer of color in transferring out of the WPD to escape racial harassment and discrimination. The following year, McGowan tried to transfer as well due to the negative work atmosphere, only to be blocked by Hoch.

8.      On January 4, 2019, McGowan wrote Johnson an email protesting "silent punishment from you based on my outspoken critiques," referring in part to his opposition to sexual harassment and race discrimination; McGowan also incidentally mentioned workplace stress. More than a week later, after McGowan had worked several shifts without incident, Johnson suddenly relieved McGowan of duty, while McGowan was in the middle of a rape investigation, and announced to the Department that McGowan was on administrative leave for "health & wellness related" reasons. Johnson insisted that McGowan undergo both a medical evaluation and a psychological evaluation (which McGowan's doctor stated was medically unnecessary) before he could return to work. This incident damaged McGowan's reputation within the Department and the Williamstown community.

9.      In the summer of 2019, McGowan was one of only two applicants for the newly created position of lieutenant within the WPD. The other applicant was a patrolman with no prior command experience, while McGowan had been a sergeant for 15 years. Johnson stated ahead of time that he would promote the patrolman to lieutenant, and Johnson and Hoch commissioned a sham promotional exam process in which the outcome was predetermined. Although McGowan was more qualified for the lieutenant position, Defendants passed him over for promotion. This

failure to promote was the culmination of a years-long pattern of subtle retaliation against McGowan for his opposition to unlawful discrimination and harassment.

## JURISDICTION AND VENUE

10.     This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; the Rehabilitation Act, 29 U.S.C. § 701 et seq.; Mass. Gen. Laws ch. 151B; and other relevant state and federal statutes and laws, as hereinafter more fully appears. All conditions to jurisdiction under Title VII, the ADA, and Mass. Gen. Laws ch. 151B have been met.

11.     This Court has subject-matter jurisdiction over claims arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over claims under state law pursuant to 28 U.S.C. § 1367.

12.     All parties reside or are located in the Western Division of the District of Massachusetts.

## PARTIES

13.     Plaintiff is a resident and citizen of Williamstown, Massachusetts.

14.     Defendant Town of Williamstown is a municipality in Berkshire County, Massachusetts. Williamstown operates the WPD.

15.     Defendant Hoch is a resident and citizen of Williamstown, Massachusetts.

16.     Defendant Johnson is a resident and citizen of Hancock, Massachusetts.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

17.     On November 12, 2019, Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination (hereinafter MCAD), regarding the matters described

herein. The MCAD, in turn, filed the complaint with the Equal Employment Opportunity Commission (hereinafter EEOC).

18.     At Plaintiff's request, the MCAD dismissed Plaintiff's charge to allow him to pursue the matter in court on or about August 5, 2020.

19.     Plaintiff received a Notice of Right to Sue from the EEOC on August 11, 2020.

20.     All of the conditions precedent to the institution of this action have been fulfilled.

## STATEMENT OF FACTS

*Background*

21.     McGowan was hired by Williamstown as a full-time police officer in 2001, commencing work in 2002 after successfully completing the police academy.

22.     In 2004, McGowan was promoted to the rank of Sergeant within the Department, a rank that he has held since then. Since approximately 2007, McGowan has served as the Department's designated investigator, in which role he has investigated crimes including rape, indecent assault and battery, and sex crimes against children, among many others.

23.     Prior to joining the Department, McGowan was a survivor of sexual assault. Motivated to protect others from similar experiences, McGowan has been an advocate on behalf of victims of sexual assault and sexual harassment, which Johnson and the Department have understood since at least early 2007.

24.     Johnson has been Chief of the Department since 2004.

25.     Hoch has been the Town Manager of Williamstown since 2015.

*Johnson Sexually Harassed McGowan And Others, And Retaliated Against McGowan for His Opposition to Harassment*

26.     In early 2007, McGowan spoke to Johnson about improving the way that the Department handled charges or investigations of sexual assault.

27.     Later that year, in or about June and July 2007, Johnson sexually assaulted McGowan in the police station four times. Specifically, Johnson rubbed his clothed penis up against McGowan's body on four different days – twice on his right arm, once on his left arm, and once on his right hand – while McGowan was sitting in the sergeant's office and trying to work on his computer.

28.     Each time Johnson assaulted McGowan, McGowan informed Johnson that his behavior was inexcusable and asked him to stop.

29.     In response, Johnson laughed and dared McGowan to write him up. McGowan spoke to others within the Department around that time to express his distaste with Johnson's actions.

30.     In a sworn statement submitted to the Massachusetts Commission Against Discrimination, Johnson denied sexually assaulting McGowan but admitted that, "[f]or a period of time early in his tenure as Chief, Johnson and others in the Department… engaged in what Chief Johnson now recognizes was unprofessional and juvenile locker room behavior…. [After] Johnson was appointed Chief, there was a general atmosphere of fun and humor that had not existed previously. The small department was fairly close and the environment was sometimes light, with some joking and pranks…. Chief Johnson, who considers himself to have been naïve at the time, realized that some of the behavior engaged in by members of the department, including himself, needed to change…."

31.     McGowan was not the only victim of Johnson's sexual harassment. On information and

belief, at least one female WPD employee was similarly victimized by Johnson.

32.     A male dispatcher, Dispatcher A,[1] wrote a letter to Johnson on August 6, 2007, stating that Johnson had "more than one time… rubbed up against my arm or elbow with your clothed penis. I also told you more than once I was uncomfortable with this action and not to do this…." Dispatcher A further wrote that Johnson's response was "a laugh and 'put a complaint into me and I will look into it.'" Dispatcher A also complained of other sexual and anti-union harassment and unprofessional conduct by Johnson. Only after Dispatcher A's letter did Johnson's sexual harassment of both McGowan and Dispatcher A cease. On information and belief, Johnson believed that Dispatcher A had written the letter at McGowan's insistence.

33.     After Dispatcher A's letter, Johnson gradually started reducing McGowan's responsibilities. Before the letter, McGowan was considered the senior sergeant (second in command of the Department), and was responsible for department scheduling and was included in substantial discussions about department operations. After the letter, Johnson removed McGowan's senior standing (making him equal to the two other, recently-promoted sergeants), took away his responsibility for scheduling, and excluded him from discussions about department operations.

34.     McGowan continued to stand up against sexual misconduct but found Johnson unwilling to take strong action. In 2011, McGowan received a report from a female Town resident that Officer B, a loose acquaintance, had arrived at her house uninvited, appearing to have been drinking. The resident was home alone with her young child. She said that Officer B repeatedly

---

[1] Due to concerns expressed by the Town about the privacy of officers and other WPD employees, and out of respect for those who are victims of discrimination or harassment, this dispatcher and several officers and employees of the Town are identified herein by pseudonyms.

asked her if she wanted to have sex, and she said no. The resident stated that Officer B exposed

himself to her and tried to put her hand on his penis. McGowan reported this incident to Johnson,

leading to an investigation by the Massachusetts State Police. Although he initially denied the

incident, Officer B admitted this behavior to State Police investigators.

35.     In response to this incident, McGowan advocated for Officer B's termination, arguing

that the Department should not tolerate sexual assault or lying by its officers. Johnson disagreed,

and disciplined Officer B but allowed him to remain on the force, where he works to this day. In

the context of Johnson's prior harassment, McGowan saw this decision as further confirmation

that sexual assault and harassment would be tolerated in his workplace.


*McGowan Stood Up Against the Racially Hostile Environment in the Department, And Faced
Further Retaliation As a Result*


36.     Sexual harassment was not the only form of discrimination perpetrated and tolerated by

Johnson in the Department. McGowan was upset and disgusted by the racial climate on

Johnson's watch as well.

37.     Officer C, who has African-American ancestry, was often a target of scorn from Johnson.

From early in Johnson's tenure and for multiple years, Johnson would take newspaper articles

that featured pictures of persons of color, both male and female, and circle the pictures with a

marker and write Officer C's initials on them, then put them in Officer C's Department mailbox.

On many other occasions in Officer C's presence, when Johnson saw a person of color entering

the police station, he would rub his eyes, look back and forth between Officer C and the other

person of color, and appear confused as if Officer C were in two places at once. On information

and belief, Officer C was also passed over for a promotion in favor of white men even though he

8

scored higher on the promotional exam.

38.    In or about 2014, Officer C was giving a tour of the police station to an African-American student at Williams College. (Williams College is located in Williamstown.) Dispatcher D, who is white, entered the station for his shift and shouted a racial slur (the N-word) to other Department members. Officer C heard the word, and Dispatcher D admitted to Johnson that he had used it. Although Officer C reported this incident to Johnson, there was no formal investigation. McGowan recommended that Dispatcher D be terminated for his offensive and racist behavior, but Johnson took no official disciplinary action; Dispatcher D was removed from a few scheduled shifts and returned to work. He remains with the WPD.

39.    In 2016, tired of the negative environment, Officer C sought a transfer to a different police force, which was willing to accept him. However, Johnson and Hoch held up the transfer, purportedly based on staffing needs. McGowan, who at that time was the president of the police union, pointed out that personnel turnover is inevitable, that the Department had other staffing issues that were not being addressed, and that the reason for denying the transfer did not stand up to scrutiny.

40.    After Johnson asked why Officer C was so anxious to leave, McGowan raised some of the racist incidents and practices described above, as well as other ways in which Johnson treated Officer C unfairly. McGowan also pointed out that Officer B had a picture of Adolf Hitler in his locker at that time, which both McGowan and Officer C (among others) found offensive. (Officer B had the Hitler photo in his locker until mid-2019, when the Department moved to a new police station.) In response, Johnson denied the allegations and threatened to terminate Officer C for untruthfulness. In response, McGowan offered to testify on Officer C's behalf and confirm these events.

41.     Johnson left to meet with Hoch. According to a sworn statement submitted to the

Massachusetts Commission Against Discrimination, Johnson and Hoch were "concerned about

possible media coverage" of Officer C's allegations of race discrimination and "decided that it

was not worth the potential damage to the reputation of the [WPD]" to continue holding up

Officer C's transfer. Officer C's transfer was immediately approved. Hoch did not investigate

Officer C's claims of discrimination.

42.     Soon afterwards, Johnson told Department employees that McGowan had accused him of

being racist, causing many of them to express disapproval of McGowan's leadership of the

union. In addition, Hoch met unlawfully with members of the union on or about January 19,

2018, without McGowan's knowledge or permission as union president. On information and

belief, during this meeting, Hoch encouraged the members to oust McGowan as union president.

Defendants' continuing efforts to undermine McGowan's standing within the union ultimately

led him to resign as union president in early 2018.

43.     After Officer C's transfer, McGowan began seeking out other professional opportunities

due to the negative atmosphere at the WPD. In February 2017, McGowan spoke with Hoch

about the possibility of transferring to another police force. Hoch stated that he would not

approve the transfer unless the other force transferred two officers to Williamstown in return. He

then questioned McGowan about Officer C's allegations against Johnson, and whether Officer C

might sue the Town. McGowan stated that the allegations were true, that he had witnessed the

behaviors Officer C described, and that Officer C was happy to get out of the Department.

McGowan's transfer did not proceed.

44.     Since 2017, Johnson has repeatedly delegated responsibilities to lower-ranking officers

instead of McGowan, even when McGowan was better suited to the tasks or when doing so

meant paying other officers overtime.

45.    As one example of steering responsibilities away from McGowan, Johnson placed

Officer Michael Ziemba on a committee overseeing construction of a new police station in 2017,

even though McGowan had been a major driving force behind the campaign to build a new

station since 2012. In 2012 and 2013, McGowan wrote to the Board of Selectmen decrying the

unsafe conditions in the existing police station, which was literally an old fraternity house.

Although Johnson responded by calling McGowan an "idiot" and told him he was wasting his

time, the Board of Selectmen tapped McGowan to serve on the Public Safety Building Study

Committee (PSBSC) in June 2013. In September 2016 and June 2017, McGowan noted that

there was no wheelchair access to the police station two-thirds of the time (when Town Hall was

closed) and advocated for access to the police station for persons with disabilities. The PSBSC

dissolved in 2017 after the Town acquired land for, and approved construction of, the new police

station. In September 2017, Johnson selected Ziemba to assist him with overseeing construction

of the new station, even though neither Johnson nor Ziemba had attended a single PSBSC

meeting. Despite McGowan's close involvement with the project, Johnson never asked him

specifically for advice or feedback. On information and belief, Johnson intentionally excluded

McGowan from participation in an important public project because of McGowan's protected

activity.

46.    Johnson's discriminatory attitudes and practices continued. In January 2018, Johnson and

McGowan were discussing whether the Town should leave the state Civil Service system.

Johnson expressed a desire to leave the Civil Service system so that he would have full discretion

over hiring decisions. McGowan praised the Civil Service process of independent testing for

promotions. Johnson responded, "Can you imagine if [Officer E] passed the promotional exam

and was number one on the list and I had to promote her?" Officer E is a woman of color.

McGowan criticized this statement and told Johnson that the Department was moving backward

when it should be moving forward.

47.     In a sworn statement submitted to the Massachusetts Commission Against

Discrimination, Johnson acknowledged asking a question "similar to" the one described in the

previous paragraph and attempted to explain it by stating that Officer E has stated "that she has

no interest in a supervisory role in the Department" and that Johnson "agrees… that she is not

suited to a supervisory role."


*McGowan's Continued Opposition to Unlawful Practices Leads to Retaliation*

48.     On December 31, 2018, Johnson sent an email to all three sergeants, criticizing them for

the limited amount of activity on certain metrics (including parking tickets). McGowan

responded on January 4, 2019, asking in an email for a meeting with Johnson. In the email,

McGowan pointed out that he was near the top of the Department in incident reports, citations,

and arrests, as he consistently had been for over 16 successive years, despite the fact that (as the

Department's investigator) he had other important duties: "It has always been my position to

prioritize felony incidents versus traffic/parking enforcement." McGowan also indicated that he

wanted to talk about "countless incidents covering over 12 years, to be a repetitive pattern where

I have been the victim of silent punishment from you based on my outspoken critiques."

Although he did not specifically use terms like sexual harassment or race discrimination, those

were significant components of the critiques McGowan was referring to. McGowan also

indicated that he wanted to discuss "physical, emotional and medical setbacks" he experienced

due to "the enormous stress I live through as the result of my biased treatment." McGowan noted

that he had used sick leave and had sought "professional medical assistance and other professional services in an effort to contend with these challenging conditions."

49.     Johnson responded an hour later that "[t]his has nothing to do with your resume" and that "the only discussion needed" was the low number of service calls and parking checks being carried out by the three sergeants.

50.     Over a week later, after McGowan worked numerous duty shifts without incident, Johnson called McGowan into his office to discuss McGowan's medical condition. McGowan confirmed what he had written in his email, and stated that his increased stress was a result of Johnson's retaliation against him. In response, Johnson demanded McGowan's badge and gun, and placed McGowan on paid administrative leave, which was not requested by McGowan and not justified by any legitimate concern that McGowan was unfit for duty.[2] Johnson quoted in a letter that same day McGowan's references to "physical, emotional and medical setbacks" and use of sick leave. Johnson required McGowan to see his primary care physician within ten days for a physical examination, and to obtain a referral for a clinical psychologist in Pittsfield for a psychological evaluation. Johnson sent an email to the entire Department in which he stated, "Sgt. McGowan will be out for an undetermined length of time on paid Administrative Leave. This is health & wellness related…." Counsel for the union, on McGowan's behalf, responded, asserting that Johnson's action violated G.L. c. 150E as well as anti-discrimination laws.

51.     In a sworn statement submitted to the Massachusetts Commission Against Discrimination, Defendants admitted that their decision to relieve McGowan of duty was

---

[2] In fact, earlier that same day, Johnson had allowed McGowan to participate in a scheduled meeting with a representative of the Massachusetts Disabled Persons Protection Commission concerning an ongoing rape investigation.

motivated in part by the "accusatory language" in his January 4, 2019, email. That "accusatory language" included opposition to retaliation and referred to past concerns about "professionalism" that, in context, included unlawful discrimination.

52.     The following week, McGowan met with his primary care physician, who immediately cleared him for duty and refused to refer him to a psychologist because it was medically unnecessary. After McGowan informed the Town of this, the Town arranged a psychological evaluation all the way across the state in Wakefield, at the Town's expense, which immediately cleared McGowan for duty. McGowan returned to work on February 12, 2019.

53.     Both during and after McGowan's administrative leave, McGowan heard that Johnson's actions had spawned rumors both within the Department and in the broader community that McGowan had experienced a significant mental health breakdown, that he might be insane, and that he might be prone to carrying out a workplace shooting. McGowan suffered further stress and reputational damage as a result of these actions.

54.     Johnson's decisions with respect to McGowan contrasted sharply with how he had treated other members of the Department who had expressed concern for stress or medical conditions in the past. For example, on or about May 30, 2009, Officer F was scheduled to work a regular shift from 7:00 am to 3:00 pm, and then an overtime patrol under a federally-funded "Click It or Ticket" grant from 3:00 pm to 7:00 pm. During his day shift, Officer F made several stops and issued several citations, but did not log them or call them in as Department procedures required. Instead, Officer F falsified log entries and citations, and called in those stops during his overtime patrol even though he actually did not make any stops or issue any citations during the overtime patrol. After Johnson learned of this, Officer F explained to Johnson that he had engaged in this dishonesty because of the stress he felt to meet the number of stops set by the Governor's

Highway Safety Bureau. Officer F was not required to undergo any medical evaluation even though he asserted that stress had caused him to violate the law significantly. Officer F had not engaged in protected activity in opposition to unlawful discrimination or retaliation.

55.     In another medical-related incident that Johnson handled differently, in or about 2011, Officer G informed McGowan that, while off duty, he had experienced a cardiac event and been hospitalized. He expressed to McGowan his belief that his medical condition was related to the stress of being an officer in the Department. McGowan and Officer G met with Johnson, where Officer G repeated these statements. In response, Johnson offered to remove Officer G from a specialized assignment and place him on a different shift to ease the stress he was experiencing. Johnson did not ask Officer G for his gun or badge. Johnson did not place Officer G on administrative leave or require Officer G to see a psychologist for a fitness-for-duty examination. On information and belief, Johnson also did not require Officer G to get a medical fitness-for-duty examination. Officer G remains on the force. Officer G also had not engaged in protected activity in opposition to unlawful discrimination or retaliation.

56.     Johnson also handled yet another medical-related incident differently in or about 2013 or 2014. In that time frame, Dispatcher D had ongoing medical issues and made several comments to employees within the Department that either threatened suicide or implied that he might harm himself. Johnson became aware of these comments and took Dispatcher D's license to carry a firearm,[3] but did not remove Dispatcher D from the schedule or require him to undergo medical or psychological fitness for duty evaluations. Although Dispatcher D's duties did not require using or carrying firearms, he could have accessed firearms at the police station during his shifts.

---

[3] Although, as Chief of Police, Johnson had the statutory authority to suspend or revoke Dispatcher D's license to carry, he did not formally do so.

Johnson took no action to prevent this. Dispatcher D also had not engaged in protected activity in opposition to unlawful discrimination or retaliation.

*In Further Retaliation, Respondents Passed Over McGowan for Promotion*

57.     Since at least 2018, Johnson was discussing the possibility of creating a Lieutenant position within the Department. (At that point, the next position below Chief was Sergeant.)

58.     In or about June 2018, Johnson told McGowan that, if a Lieutenant position was created, Johnson would promote Michael Ziemba, a patrol officer, to that position. Ziemba had also been a member of the Department for a long time. Ziemba had not spoken out against discrimination or retaliation. Ziemba also did not have any managerial experience as a superior officer.

59.     On June 14, 2019, counsel for McGowan sent a letter to counsel for the Town, protesting a pattern of discrimination and retaliation by the Town (including relieving McGowan of duty in January 2019) and indicating that McGowan was addressing these matters through a union grievance process but reserved his rights to take individual action.

60.     On June 26, 2019, Johnson formally posted the position of Lieutenant for applications. There were only two applicants – McGowan and Ziemba. Both underwent in-person testing by a third party contracted by the Town on July 31, 2019. The tests included written exercises, role playing, and an interview, among other things. The third party scored Ziemba higher than McGowan on each of five activities by between 0.6 and 1.8 points out of 100.

61.     Although Johnson had previously and successfully advocated for leaving the Civil Service system to gain control over the hiring and promotional processes, Johnson and Hoch wrote in a sworn statement before the Massachusetts Commission Against Discrimination that

they had decided in advance to promote whichever candidate scored higher on the third-party

assessment. Thus, purportedly based solely on this assessment, Johnson recommended hiring

Ziemba, a recommendation that Hoch accepted. Ziemba was promoted to Lieutenant on August

15, 2019, as a result of which he received significant increases in pay, benefits, and

responsibilities, beyond those of McGowan as a sergeant.

62.      However, this assessment process was a sham. Johnson failed to follow all procedural

requirements of the relevant Collective Bargaining Agreement in multiple ways. All of the

measurement categories were subjective, and on information and belief, McGowan's

performance was in fact higher than that of Ziemba. If not for the retaliation and discrimination

described above, McGowan would have gotten the promotion.

63.      In fact, Johnson had already made up his mind long before McGowan even applied for

the position. He had said as much in 2018. And when the Department moved into a new police

station on or about July 9, 2019, Ziemba moved directly into the office designated for the

Lieutenant – more than a month before any decision about the promotion was allegedly made.

No other patrol officer has or had his or her own office. Even two of the sergeants are sharing an

office in the new police station.

64.      Hoch agreed with Johnson in advance on a promotional process in which Hoch would

accept Johnson's recommendation. On information and belief, Defendants engineered this

process and promoted Ziemba over McGowan at least in part because of his protected activity.

COUNT ONE
Retaliation
Mass. Gen. Laws ch. 151B, §§ 4, 9
(All Defendants)

65.     Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated

in the previous paragraphs.

66.     Plaintiff engaged in protected activity including, but not limited to, reporting and

opposing sexual harassment and other sex discrimination, race discrimination, racial harassment,

and disability discrimination, and aiding and encouraging others in enjoying their rights to be

free of unlawful discrimination.

67.     Plaintiff undertook these protected activities reasonably and in good faith in order to

combat wrongful discrimination.

68.     Defendants were aware of Plaintiff's protected activity.

69.     Because of his protected activity, Defendants engaged in materially adverse actions with

respect to McGowan, in violation of Mass. Gen. Laws ch. 151B, § 4(4) and (4A).

70.     As a result of Defendants' unlawful acts, McGowan has suffered lost wages and benefits,

reduced future career opportunities, emotional distress (including physical manifestations of such

distress), and reputational damage.

COUNT TWO
Retaliation
Title VII of the Civil Rights Act of 1964
42 U.S.C. §§ 2000e-3(a), 2000e-5
(Town of Williamstown)

71.     Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated

in the previous paragraphs.

72.     Plaintiff engaged in protected activity including, but not limited to, reporting and

opposing sexual harassment and other sex discrimination, race discrimination, and racial

harassment, and aiding and encouraging others in enjoying their rights to be free of unlawful

discrimination.

73.     Plaintiff undertook these protected activities reasonably and in good faith in order to

combat wrongful discrimination.

74.     Defendants were aware of Plaintiff's protected activity.

75.     Because of his protected activity, Defendants engaged in materially adverse actions with

respect to Plaintiff.

76.     As a result of Defendants' unlawful acts, McGowan has suffered lost wages and benefits,

reduced future career opportunities, emotional distress (including physical manifestations of such

distress), and reputational damage.

**COUNT THREE**
Handicap Discrimination
Mass. Gen. Laws ch. 151B, §§ 4, 9
(Town of Williamstown)

77.     Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated

in the previous paragraphs.

78.     In or about January 2019, Plaintiff was a qualified handicapped person within the

meaning of Mass. Gen. Laws ch. 151B, §§ 1(16) and (17), because Defendants regarded him as

having a mental health issue or other medical impairment substantially limiting one or more

major life activities, and he was capable of performing his job without accommodation.

79.     Defendants took adverse employment actions against Plaintiff, including but not limited

to relieving him of duty and announcing this action in such a way as to damage Plaintiff's

19

reputation.

80.     Defendants took these adverse employment actions because they regarded Plaintiff as

handicapped.

81.     As a result of Defendants' unlawful acts, McGowan has suffered emotional distress

(including physical manifestations of such distress), and reputational damage.


COUNT FOUR
Americans with Disabilities Act
42 U.S.C. §§ 2000e-5, 12112, 12117
(Town of Williamstown)

82.     Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated

in the previous paragraphs.

83.     In or about January 2019, Plaintiff was a person with a disability as defined by the

Americans with Disabilities Act, because Defendants regarded him as having a mental health

issue or other medical impairment substantially limiting one or more major life activities, and he

was capable of performing his job without accommodation.

84.     Defendants took adverse employment actions against Plaintiff, including but not limited

to relieving him of duty and announcing this action in such a way as to damage Plaintiff's

reputation.

85.     Defendants took these adverse employment actions because they regarded Plaintiff as

disabled.

86.     As a result of Defendants' unlawful acts, McGowan has suffered emotional distress

(including physical manifestations of such distress), and reputational damage.

COUNT FIVE
Rehabilitation Act
29 U.S.C. § 794a
(Town of Williamstown)

87.     Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated

in the previous paragraphs.

88.     In or about January 2019, Plaintiff was a person with a disability as defined by the

Rehabilitation Act and the Americans with Disabilities Act, because Defendants regarded him as

having a mental health issue or other medical impairment substantially limiting one or more

major life activities, and he was capable of performing his job without accommodation.

89.     Defendants took adverse employment actions against Plaintiff, including but not limited

to relieving him of duty and announcing this action in such a way as to damage Plaintiff's

reputation.

90.     Defendants took these adverse employment actions because they regarded Plaintiff as

disabled.

91.     As a result of Defendants' unlawful acts, McGowan has suffered emotional distress

(including physical manifestations of such distress), and reputational damage.

WHEREFORE PLAINTIFF REQUESTS THAT THE COURT ORDER:

a.     That judgment be entered for him and against Defendants;

b.     That Plaintiff be compensated for any loss of wages and/or benefits, damage to reputation

and earning capacity, and other damages incurred as a result of Defendants' unlawful acts;

c.     That Plaintiff be awarded an amount of money that will fairly compensate him for the

emotional and physical pain and suffering caused by Defendants' unlawful acts;

d.      That Defendants pay Plaintiff's costs and attorneys' fees resulting from this action;

e.      That Defendants pay Plaintiff interest on any judgment entered from the time of the filing

of this suit at the MCAD;

f.      That Defendants be ordered to pay Plaintiff multiple and/or punitive damages;

g.      That Defendants be enjoined from unlawful discrimination, harassment, and retaliation;

h.      A declaration of the rights of the parties; and

i.      Such relief as may be just and proper and/or that will make Plaintiff whole.


**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**


Respectfully submitted,
SCOTT MCGOWAN,
By His Attorney,


  _/s/David A. Russcol_____
David A. Russcol (BBO #670768)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
drusscol@zalkindlaw.com


Dated:  August 12, 2020